IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
CA NO.: 5:18-CV-219-D

LAURA PONTONES, on behalf of herself and all others similarly situated,

*Plaintiff,*

v.

SAN JOSE RESTAURANT, INCORPORATED; SAN JOSE MANAGEMENT, INC.; SAN JOSE MEXICAN RESTAURANT #2 OF LUMBERTON, INC.; SAN JOSE MEXICAN RESTAURANT OF ELIZABETHTOWN, INC.; SAN JOSE MEXICAN RESTAURANT OF N.C. INC.; SAN JOSE MEXICAN RESTAURANT OF OAK ISLAND, INC.; SAN JOSE MEXICAN RESTAURANT OF PEMBROKE, NC, INC.; SANJOSE MEXICAN RESTAURANT OF RALEIGH INC.; SAN JOSE MEXICAN RESTAURANT OF SHALLOTTE, INC.; SAN JOSE OF ROCKY MOUNT #2 INC.; SAN JOSE OF ZEBULON, INC.; SAN JOSE OF ROANOKE RAPIDS, INC.; HECTOR FLORES; ALBERTO FLORES; JOSUE FLORES; JOSE PEREZ; VICENTE PEREZ; PABLO MEZA; EDGARDO FLORES; and EDGAR FLORES,

*Defendants.*

**DEFENDANTS' BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

Dated: February 11, 2020

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

FACTS ................................................................................................................................... 2

   A.   Plaintiffs ................................................................................................................ 2

   B.   Defendants............................................................................................................. 3

      1.      Ownership of Restaurants........................................................................ 3

      2.      Plaza Azteca and the Poyner Restaurant. ............................................... 4

      3.      Individual Defendants.............................................................................. 4

   C.   Management of Restaurants. ................................................................................. 5

   D.   Tip Pools. .............................................................................................................. 5

   E.   Wages, Tips, and Hours Worked. ......................................................................... 6

      1.      Recording Sales and Tips in the POS System. ....................................... 7

      2.      Reconciliation. ........................................................................................ 8

      3.      Payment of Cash Wages to Servers. ....................................................... 9

      4.      Processing of Payroll and Taxes by Accounting Firms........................... 9

      5.      Detailed Analysis of Named Plaintiff's Payroll Information. ...................... 10

STANDARD OF REVIEW ................................................................................................... 10

ARGUMENT AND AUTHORITY ....................................................................................... 11

   A.   Plaintiffs' Claims of Minimum Wage Violations Are Contradicted by Undisputed Evidence and Should Be Dismissed......................................................................... 12

      1.      Plaintiffs' Claim of "Zero Wages" Is Contradicted by Undisputed Record Evidence. ...................................................................................... 12

      2.      Wages Were Applied to Offset Taxes Owed................................................ 13

      3.      The Undisputed Facts Demonstrate That Plaintiff's Hours Worked and Tips Received Were Correctly Recorded. ............................................... 16

      4.      Tip Pools Were in Compliance with the FLSA. ............................................ 18

      5.      Plaintiffs Have Failed to Present Evidence That Any Individual Defendant is an Employers Within the Meaning of the FLSA and NCWHA. ................... 20

      6.      Plaintiff's Class Claims Are Due to Be Dismissed for Want of Evidence.... 23

CONCLUSION...................................................................................................................... 24

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
CA NO.: 5:18-CV-219-D

| | | |
|---|---|---|
| LAURA PONTONES, on behalf of herself and all others similarly situated, | ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) ) | **DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| SAN JOSE RESTAURANT, INCORPORATED; et al., | ) ) ) | |
| *Defendants.* | ) ) | |

## INTRODUCTION

Defendants have moved for summary judgment against Plaintiffs Laura Pontones, Oscar Torres and the Class and Collective Group (hereinafter "Class") they represent because the Defendants' policies and practices with respect to hours worked and compensation paid, which vary among the 12 Restaurant Defendants, do not violate the Fair Labor Standards Act (FLSA), 29 U.S.C. §216(b), or the North Carolina Wage & Hour Act, N.C.G.S. §95-25. The 12 Restaurant Defendants are not franchises; each is separately managed, separately operated, and separately owned. Each of the 12 Restaurant Defendants is owned by a different collection of co-owners and separately managed. Each restaurant files a separate tax return under the guidance of its own CPAs.

Following investigations of 7 restaurants by the Wage & Hour Division of the U.S. Department of Labor that ended in a settlement five years ago, each of the Defendant restaurants, on the advice of their CPAs, implemented a Point-of-Sale ("POS") computerized system to track employee hours, tips, and sales. In addition, during the last five years there have been significant changes in the ownership of the restaurants which underscore their autonomy.

Acting on her own behalf and allegedly for other restaurant servers, Named Plaintiff filed this suit against the 12 Restaurant Defendants and 7 individual Defendants. The suit alleges that the servers were denied minimum wage and overtime wages; received no compensation other than tips; and were subjected to illegal deductions from their pay.

All 12 Restaurant Defendants have offered evidence showing their pay practices comply with the law. In support of summary judgment, the Restaurants have submitted employee pay stubs and POS records of hours worked and tips and wages received, evidence supported by the declarations of restaurant managers and CPAs, which prove that the Plaintiff and the other servers were paid wages in addition to tips for *all* hours worked; received compensation in excess of the legal minimum for all regular and overtime hours worked; and were not subject to any illegal deductions from their pay. Nine of the 12 Defendant Restaurants did not have tip pools. The 3 that had tip pools have presented evidence showing their tip pools comply with applicable laws: employees were notified in advance and were fully informed about the tip pool, and the pool was composed exclusively of other employees who regularly receive a portion of their pay from tips. Plaintiffs also fail to demonstrate that any of the 7 individual Defendants were "employers" within the meaning of the FLSA or the NCWHA. In every respect Defendants' pay practices fully complied with both the FLSA and the applicable North Carolina law. Summary judgment should be entered in favor of Defendants and all Plaintiff's claims dismissed.

## FACTS

### A.    Plaintiffs

Named Plaintiff Laura Pontones, worked as a server for a Mexican restaurant which she identified in her First Amended Complaint as San Jose in Brier Creek, North Carolina (actually, Defendant Plaza Azteca Raleigh, Inc., d/b/a San Jose Tacos and Tequila) ("Plaza Azteca") from approximately November 2016 to January 2017; and at another restaurant in Poyner Village, North

Carolina (Defendant San Jose Mexican Restaurant of Raleigh Inc.) ("Poyner") from January 2017 until April 2017, and then in July and August 2017. (Appendix 17, ¶1.) Named Plaintiff asserts claims for allegedly unpaid minimum and overtime wages on behalf of herself and a conditionally-certified class of servers who worked for Defendants. (Dkt. 7.)

**B.** **Defendants**.

Named Plaintiff has sued 9 restaurants, in addition to the 2 where she worked; and 4 individuals, in addition to the 3 who owned the restaurants where they had worked, as Defendants. (Dkt. 7.) It is undisputed that Named Plaintiff never worked for any of the other Defendant Restaurants or for any individual owners or investors named as Individual Defendants other than Hector Flores and Josue Flores. (Appendix 15, ¶1; Appendix 22.)

1. Ownership of Restaurants.

The 12 Defendant Restaurants are owned by a collection of individuals with ownership interests ranging generally from 12.5 percent to 33.3 percent. (Deposition of Hector Flores, (hereinafter "Appendix 23") at 17-18; 26-27; 33, 39; 43; 48-50; 59-60; see also Appendix 16.) There is no single corporate entity that owns the 12 Defendant Restaurants, and none is either the parent or the subsidiary of any other. While there is some overlap among the shareholders, and several share familial relationships, other shareholders are not related to anyone else. Most of the shareholders are passive investors who play no active role in operating any of the Defendant Restaurants on a day-to-day basis. (Appendix 16.) Each of the restaurants files its own separate Federal and state income tax returns and each fails or succeeds on its own efforts. There is no sharing of employees or centralized purchasing or even a common menu.

2.     Plaza Azteca and the Poyner Restaurant.

The two restaurants where Named Plaintiff worked are owned in varying degrees by Defendants and non-defendants. (Appendix 15, ¶2.) Defendant Josue Flores owns 60.0% of Plaza Azteca Raleigh, Inc.; Defendant Hector Flores owns 20.0%; and non-defendant Stefani Barahona owns 20.0%. (Appendix 16, p. 12.) At San Jose Mexican Restaurant Raleigh, Inc. (Poyner), Defendants Josue Flores and Hector Flores each own 26.67%; non-defendant Ruben Leon also owns 26.67%; and non-defendants Fernando Ayala and Matilde Onate each own 10.0%. (Appendix 16, p. 11.)

3.     Individual Defendants.

Defendant Hector Flores, an investor in several of the Defendant Restaurants, has only a ninth-grade education. (Appendix 23 at 80.) Mr. Flores did not play an active role in the management of any restaurant, nor did he work on anything related to the restaurants while at his home. (Appendix 23 at 125, 152.) Mr. Flores seldom even visits the restaurants in which he has a part ownership interest. (Appendix 23 at 125-126.) The managers make all the decisions: he stated, "I don't go in there and tell them what to do." (Appendix 23 at 133.) When asked specifically about the Plaintiff in this case, Hector Flores testified that he did not know her or anything about her hiring, her W-2, her I-9, her pay, or even who she was, and did not recognize her name. (Appendix 23 at 134, 141.) Mr. Flores does not hire or fire employees or determine their pay. (Appendix 23 at 141.) According to Hector Flores, "[the managers] do all the work. I don't do nothing on the restaurant." (Appendix 23 at 152.)

Individual Defendants Edgar Flores, Jose Perez, Vincente Perez, and Pablo Meza have no interest in the restaurants where Plaintiff Pontones worked. Plaintiff fails to provide any basis or facts for claims against these individuals.

C.     **Management of Restaurants.**

Each of the 12 Defendant Restaurants is separately managed. Each employs a manager responsible for implementing and enforcing personnel and payroll policies and practices at each of the 12 Restaurants. (See Appendix Nos. 1-11, Declarations of those Managers.) The managers instructed servers to personally and accurately record their work time, and cash and credit card tips received, in the restaurant's POS system. (Id. at ¶4 of each Declaration.) Each day, the POS system tracks each employee's time worked, sales, and tips earned. If a server fails to note his or her start and stop times, the manager will discuss the server's omission personally with the server, and both agree on and enter the amended work time. Servers were paid an hourly rate of no less than $2.13 for the first 40 hours worked per week, and no less than $5.76 overtime rate for any hours worked in excess of 40 hours. (Id. ¶5.) All tips, both cash and credit card, that a server earned each day were paid out daily to each server at the end of their shifts. (Id. ¶6.) Servers meticulously review the amount of their tips. (Id. ¶7.) Some of the 12 Restaurant Defendants require servers to sign their pay statement to confirm agreement on the payment received. (Id.)

D.     **Tip Pools.**

The three restaurants that operated tip pools are Plaza Azteca (San Jose of Raleigh, Inc.); San Jose of Rocky Mount #2 ("Rocky Mount #2"); and San Jose of Raleigh ("Poyner"). See Appendix 1, Declaration of Zabdi Maquiel Reyes Baca (Baca Dec.) (San Jose of Rocky Mount #2); Appendix 2, Declaration of Edy Barahona (Barahona Dec.) (Plaza Azteca); and Appendix 3, Declaration of Delis Nolasco (Nolasco Dec). (San Jose of Raleigh – Poyner Village). At the end of each shift in these three restaurants, the POS system automatically deducts 3% of all sales made by the servers. (At Rocky Mount #2, the deduction is not more than 1 ½% for a half shift and not more than 3% for a whole shift.) (Id.) That money is paid to the busboys, food runners, and

guacamole preparers at Plaza Aztec; to the busboys, food runners and bartenders at Rocky Mount #2; and to the busboys and food runners and at Poyner. (See Appendix Nos. 1-3, Baca, Barahona and Nolasco Decs.)

The amount of not more than 3% is deducted from the servers' POS entries, is identified in and paid with the non-server tipped employees' bi-weekly payroll checks. The servers are informed about this practice. (Baca Dec.; Barahona Dec.) Named Plaintiff acknowledges that she was informed that 3% of total sales would be deducted from her tip earnings and paid to the chip and busboy personnel. (Pontones Dec. (Appendix 15 at 1).) Further, Named Plaintiff acknowledges that she received training at the beginning of her employment. (Pontones Dec. (Appendix 15 at 1.) Server training includes the review of the employment handbook that cover the tip pool practices. The servers then receive their cash and credit card tips in cash, less the 3% tip share, at the end of every shift. (See Appendix Nos. 1 – 3, Baca, Barahona and Nolasco Declarations.)

**E.** **Wages, Tips, and Hours Worked.**

Three accounting firms provide services to the 12 Defendant Restaurants. In 2014, the accounting firm Buena Vista Business Consulting, Inc. ("BVBC") advised its clients San Jose Mexican Restaurant of N.C., Inc. (Lumberton #1), San Jose Mexican Restaurant #2 of Lumberton, Inc., San Jose Mexican Restaurant of Pembroke NC, Inc., and San Jose of Roanoke Rapids, Inc., to implement a Point of Sale (POS) computer system. The POS system is a combination of hardware and software that incorporates multiple administrative, personnel, and sales functions. This includes an all-in-one cash register, credit card processor, time management system (recording employee start and stop work times), inventory control, and gift card management. During 2014 and 2015, those 4 Restaurant Defendants implemented the POS system and held

training for managers and employees, including the servers. (Appendix 13, Declaration of Edilene Johansson. ("Johansson Dec.")); Appendix 4, Declaration of Efrain Valadez ("Valadez Dec.").

In 2015, San Jose Mexican Restaurant of Elizabethtown, Inc., implemented its own POS system described above. Appendix 5, Declaration of Luis Fernando Ayala Leon (Leon Dec.).

By 2016 all of 12 of the Defendant Restaurants had implemented POS systems. (Appendix Nos. 1-11, Declarations of Managers, ¶2.)

1.     Recording Sales and Tips in the POS System.

Servers act as their own cashiers, directly handling each customer transaction and thereby controlling the receipt of all funds, including tips. Even if a cashier is available to assist the servers in the busiest periods, servers are informed of all transactions and reconcile their sales and tips at the end of their shift. All of the servers' transactions are entered in real time by the servers and then reconciled at the end of their day using the POS system. (Appendix Nos. 1-11, Declarations of Managers, ¶¶2, 6, 7 and 8.)

The various restaurant managers instructed the servers to personally and accurately record their work time, and cash and credit card tips received using the POS system. (Id.) If a server fails to record the in or out time, the manager discusses the server's omission personally with the server, and both agree on and record the amended work time. Employees also are instructed to accurately record cash and credit card tips. (Appendix Nos. 1-11, Declarations of Managers)

Named Plaintiff admitted that "employees had access to a computer system to clock into and out of work." She further stated that she did clock in but claimed that she was "not required to clock out at the end of the shift." Declaration of Plaintiff (Appendix 15). However, the POS system shows entries at the beginning *and* end of each day for Named Plaintiff. While she asserts, she was not required to clock out, it appears that she did. These conflicting statements notwithstanding, the

evidence proves without dispute that her Restaurant employer properly maintained records showing Named Plaintiff's in and out times and all cash and credit card tips received.

The POS system records demonstrate when Named Plaintiff began and ended work each day. For example, on page one of Appendix 21, for the pay period 8/6/17 to 8/19/17, the POS records show that Named Plaintiff recorded her time in from as early as 9:10 to as late as 16:49 and her time out as early as 20:11 and as late as 1:26. A review of all the weeks Named Plaintiff worked for 2 of the 12 Defendant Restaurants does not show a single day for which the 2 Restaurants do not have a record of when Named Plaintiff started and ended work. Even if the Court should find that there is a disputed material fact as to Named Plaintiff, there is no evidence whatsoever, only her unsupported and general allegation, that any other Class Member is similarly situated.

    2.   <u>Reconciliation</u>.

All tips a server earns during a given shift are paid out to them in cash at the end of their shift. (Appendix Nos. 1-11, Declarations of Managers, ¶7.) At the 9 Restaurants that do not have any tip pooling, the tips earned, as shown by the POS system, are paid in full to the servers at the end of each shift. Using the POS computer system, each server prints out daily a receipt entitled "Checkout" that documents, among other things, the server's sales for the day, cash transactions, credit card tips, and (if applicable) the server's contribution to the tip pool and any balance owed to the server or Restaurant. (Appendix Nos. 1-11, ¶7.) Some of the Restaurants require servers to sign the "Checkout" receipt to confirm the accuracy of the information contained therein.

3.      <u>Payment of Cash Wages to Servers</u>.

All of the 12 Restaurant Defendants pay their servers an hourly rate of pay of no less than $2.13 for the first 40 hours worked per work week, and no less than a $5.76 overtime rate for any hours worked in excess of 40 hours. (Appendix Nos. 1-11, Declarations of Managers, ¶5.)

4.      <u>Processing of Payroll and Taxes by Accounting Firms</u>.

Every two weeks the Restaurants forward the data obtained from their individual POS systems to their accounting firms so the accountants can prepare the payroll. (Appendix Nos. 1-11, Declarations of Managers, ¶¶ 8 and 9.)  This data includes the record of the hours worked, credit card tips, and cash tips recorded by each server. Using the computerized data, the various accounting firms create paychecks for each employee and calculate the correct amounts to be withheld to cover FICA, Medicare, State and Federal taxes. (Appendix 12, ¶¶ 2, 8 and 9; Appendix 13, ¶¶ 6 and 7; Appendix 14, ¶¶ 6 and 7.)  If the records show that a server worked over 40 hours in a week, overtime pay is calculated and paid. (Overtime is rare.)  The accounting firms receive funds separately from each of the 12 Defendant Restaurants to cover the checks issued to the employees and the taxing authorities.  (Id.) The accountants also calculate and file employee Forms W-2 (Wage and Tax Statement), Forms 941 (Employer's Quarterly Federal Tax Return), quarterly Forms W-3 (Transmittal of Wage and Tax Statements), income tax filings, sales tax reports, and related required filings.  (Id.)

After payment of regular and overtime pay and the deduction of state and Federal taxes, due to the sizeable amount of tips earned by the servers, the net amount of the check issued to the server often is zero.  (Appendix 12, ¶4; Appendix 13, ¶13; Appendix 14, ¶8; see also Appendix 5, Leon Dec.) In fact, one CPA who provides accounting services to some of the Defendant Restaurants routinely fields calls from managers and servers seeking an explanation of the net

$0.00 balance on the payroll checks: this CPA has repeatedly explained how the required tax payments on the wages and tips reduce the balance of the check to $0.00. (Appendix 14, Cribb Dec., ¶9.)

     5.    <u>Detailed Analysis of Named Plaintiff's Payroll Information</u>.

Records which show Named Plaintiff's hourly wages, regular and overtime hours worked, cash tips, and credit card tips are attached hereto as Appendix 17. Plaintiff's redacted W-4 form also is attached. (Appendix 18). Plaintiff's pay statements show her gross earnings, composed of cash wages and tips; and amounts deducted and paid on her behalf to the various State and Federal taxing authorities.

## <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate pursuant to Fed.R.Civ.P. 56 when no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S. Ct. 2505 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Caretta,* 477 U.S. 317, 325, 106 S. Ct. 2548 (1986). Once the moving party has met its burden, the non-moving party may not rest on the allegations or denials in its pleading, *Anderson,* 477 U.S. at 248, 106 S. Ct. 2505, but "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348 (1986) (quoting Fed.R.Civ.P. 56(e)). Summary judgment is not a vehicle for the court to resolve disputed factual issues. *Faircloth v. United States,* 837 F.Supp. 123, 125 (E.D.N.C.1993). Instead, a trial court reviewing a claim at the summary judgment stage should determine whether a genuine issue exists for trial. *Anderson,* 477 U.S. at 249, 106 S. Ct. 2505. In making this determination, the court must view the inferences drawn from the underlying facts in the light most favorable to the non-moving party. *United States v. Diebold, Inc.,* 369 U.S.

654, 655, 82 S. Ct. 993 (1962) (per curiam). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. *Anderson,* 477 U.S. at 247–48, 106 S. Ct. 2505. Accordingly, the court must examine "both the materiality and the genuineness of the alleged fact issues" in ruling on this mon. *Faircloth,* 837 F.Supp. at 125.

## ARGUMENT AND AUTHORITY

Judgment should be entered in favor of all Defendants on all of Plaintiffs' claims because Named Plaintiff has failed to demonstrate that Defendants violated the FLSA or the NCWHA. Plaintiffs' claim that servers were paid tips only has not been proven. Data obtained from the POS systems show that the 12 Defendant Restaurants recorded the servers' hours worked and their cash and credit card tips. The declarations provided by the accounting firms who handle payroll services uniformly establish that all 12 of the Restaurant Defendants paid the servers the required tip credit cash wages, even though government tax withholdings paid by the 12 Defendant Restaurants on behalf of the servers soaked up their cash wages, resulting in "net zero" paychecks.

Plaintiff's allegations about improper tip pool deductions have absolutely no application to 9 of the 12 Defendant Restaurants because they did not have tip pools. In the absence of a tip pool, those allegations must fail as a matter of fact and law against 9 of the 12 Defendant Restaurants. With respect to the 3 Defendant Restaurants that did operate tip pools, they submitted evidence showing their tip pools were organized in compliance with the FLSA because employees were notified in advance and participation was limited to employees who routinely receive a portion of their earnings from tips.

Plaintiffs fail to produce evidence showing that any of the 7 Individual Defendants were employers within the meaning of the FLSA and NCWHA. Most of the Individual Defendants were passive investors who owned minority interests in one or more of the Restaurants. Defendant Hector Flores should be dismissed because there is no evidence that he was Named Plaintiff's

employer within the meaning of the law: the evidence shows that he was only a passive investor who played no role in the management of any restaurant where Named Plaintiff worked, and thus is not liable as an employer.

Named Plaintiff's claims under the FLSA and NCWHA also should be dismissed on the merits because there is no factual basis for her claim that other members of the putative class – those who worked for other 10 Defendant Restaurants other than Plaza Azteca and Poyner -- were denied minimum wage or overtime pay or subjected to illegal tip-pooling or deductions.

A.     **Plaintiffs' Claims of Minimum Wage Violations Are Contradicted by Undisputed Evidence and Should Be Dismissed.**

Plaintiffs complain that they were paid tips only and denied cash wages, but documentary evidence tells another story. Servers act as their own cashiers and at the end of each shift, the servers cash out their tips: the restaurants pay the servers cash in hand equal to the amount of declared tips, which includes cash and credit card tips. Documentary evidence demonstrates that the servers were paid tip credit cash wages for all hours worked, even though the paychecks were consumed by mandatory tax withholdings. The conditions about which Plaintiffs complain are nearly universal in the restaurant industry among employees who earn substantial tips, and zero net checks do not necessarily violate the FLSA or the NCWHA.

1.     Plaintiffs' Claim of "Zero Wages" Is Contradicted by Undisputed Record Evidence.

Tipped servers routinely receive "net zero" paychecks from their employers because their tip credit wages – legally $2.13 per hour – are more than consumed by Federal and State tax withholding, FICA and Social Security payments made on their behalf, and to their benefit, by the employer based on their total earnings, i.e., cash wages plus tips. The "net zero" check does not mean that employees are working just for tips, but rather that the employer-paid portion of their

wages is gobbled up by mandatory payments made directly to the government on the employee's behalf with the taxing authorities.

Plaintiff's perception that she was paid tips only reflects a lay person's common misunderstanding of the pay system and fails to recognize that employers are required to apply their cash wages to pay taxes. (Appendix 14, Cribb Declaration, ¶9.) Plaintiff's misunderstands the pay process and fails to recognize that employers are required to apply their cash wages to pay taxes. It is easy to see how servers could believe that they are only being paid tips, but it simply is not true. Named Plaintiff's cash wages were paid out to the government to satisfy the withholding requirements set by Federal and state law.

    2.    <u>Wages Were Applied to Offset Taxes Owed</u>.

Named Plaintiff declared that "I received no wages for any of my hours worked. My only income came from customers' tips." (Appendix 15, ¶5.) The statement is true only in the sense that she did not receive any more take-home pay with her biweekly earnings statement. She admits that she took home her tips after each shift. (Appendix 15, ¶5.) She owed taxes on those earnings. The <u>net</u> amount of her checks was zero because her employer applied her cash wages to satisfy her tax obligations to the Federal and state government, as it is required by law to do.

Because the FLSA allows an employer to apply only a tipped employee's cash wages -- $2.13 per hour during the relevant period – to mandatory withholdings on an employee's behalf, and because the amounts due to be withheld based on Named Plaintiff's earnings exceeded her cash wages, the result was a "net zero" paycheck that recorded payments made on her behalf to Social Security, Medicare, and State and Federal taxes. However, she collected her cash and credit card tips at the end of each shift.

The tables below demonstrate that Named Plaintiff's total earnings from tips plus cash wages required that the entire amount of her cash wage earnings be applied towards mandatory withholdings: in fact, Named Plaintiff owed substantially more in taxes than the wages that her employer paid to the government on her behalf. The first table, based on an exhibit from Hector Flores' deposition introduced by Plaintiff, shows Named Plaintiff's earnings statements reflecting hours worked, cash wages, reported tips, and tax deductions, and shows zero net pay:

| Pay Period | Hours | Cash Wages | Reported Tips | Tax Deductions | Net Pay |
|---|---|---|---|---|---|
| 02/19/17 – 03/04/17 | 68.31 | $145.94 | $1,125.00 | $145.94 | 0.00 |
| 03/05/17 – 03/18/17 | 78.07 | $166.39 | $1,343.00 | $166.39 | 0.00 |
| 03/19/17 – 04/01/17 | 66.41 | $142.04 | $1,269.69 | $142.04 | 0.00 |
| 04/02/17 – 04/15/17 | 66.41 | $142.04 | $1,269.00 | $142.04 | 0.00 |
| 07/09/17 – 07/22/17 | 65.32 | $139.59 | $964.64 | $139.59 | 0.00 |
| 07/23/17 – 08/05/17 | 58.59 | $125.63 | $914.30 | $125.63 | 0.00 |
| 08/05/17 – 08/19/17 | 72.43 | $154.89 | $895.00 | $154.89 | 0.00 |

The next table shows hours, earnings, and also the amount of taxes Named Plaintiff actually owed based on her earnings statements from San Jose Mexican Restaurant of Raleigh (Poyner) during the identical period:

| Pay Period | Total Earnings | SS and Medicare 7.65% | Federal Withholding | NC Withholding | Total Taxes Owed | Total Withholding By Co. | Total Still Due |
|---|---|---|---|---|---|---|---|
| 2/19/17 – 3/04/17 | $1,270.95 | $97.23 | $127.53[1] | $47.41 | $272.17 | $145.94 | $126.23 |

---

[1] Using the bi-weekly table for "Single no additional deductions," as Plaintiff Pontones designated in her W-4 form, would require a Federal tax withholding of $127.53 (approximately 10%). For North Carolina withholding, the table requires entering the bi-weekly wages $1,270.95 minus the standard deduction of $384.62, multiplied by the number of allowances (she did not claim any)

| Pay Period | Total Earnings | SS and Medicare 7.65% | Federal Withholding | NC Withholding | Total Taxes Owed | Total Withholding By Co. | Total Still Due |
|---|---|---|---|---|---|---|---|
| 3/05/17 – 3/18/17 | $1,509.39 | $155.47 | $156.15 | $60.18 | $331.80 | $166.39 | $165.41 |
| 3/19/17 – 4/01/17 | $1,411.73 | $107.00 | $144.43 | $54.95 | $306.38 | $142.04 | $164.34 |
| 4/02/17 – 4/15/17 | $1,411.04 | $107.94 | $144.34 | $54.91 | $307.19 | $142.04 | $165.15 |
| 7/09/17 – 7/22/17 | $1,104.23 | $84.47 | $107.53 | $38.50 | $230.50 | $139.59 | $90.91 |
| 7/23/17 – 8/05/17 | $1,039.93 | $79.55 | $99.81 | $35.06 | $214.42 | $125.63 | $88.79 |
| 8/05/17 – 8/19/17 | $1,049.89 | $80.32 | $101.01 | $35.59 | $216.92 | $154.89 | $62.03 |

Named Plaintiff apparently assumed that because her earnings statements showed zero net pay, she was being cheated out of her wages. This is not correct. The amounts withheld were not sufficient to cover the required withholding, but an employer can only withhold from the cash wages, not tips. Put another way, the reason for the "net zero" checks is that the entire amount of her cash wages was used to pay part of the taxes she owed. (See IRS Notice 1036 withholding tables, Appendix 19.) As the declarations by the restaurant managers and accounting firms demonstrate, the same was true at all of the Defendant restaurants. (Appendix 12, ¶4; Appendix 13, ¶13; Appendix 14, ¶8; see also Appendix Nos. 4-5, 7-10, ¶12.)

---

yields net taxable bi-weekly wages of $886.13. The North Carolina withholding is determined as .0535 times the net wages of $886.13, for a total of $47.41. (See Appendix 20, NC–30 Withholdings.) For Plaintiff's earnings and her reported status on her W4, her withholding would be $97.23 (Social Security and Medicare) plus $127.53 (federal withholding) plus $47.41 (NC withholding) for total withholdings of $271.77, which is far in excess of the $145.94 cash wages her employer paid her. The amount of tax owed on Plaintiff's total wages, including declared tip income, in that pay period thus exceeded -- by $125.93 -- the maximum amount her employer could legally withhold, i.e. her tip credit cash wages of $2.13/hour.

The undisputed facts show that Plaintiffs' employers did not deprive them of cash wages: the government did. Summary judgment is due to be entered in favor of Defendants on Plaintiffs' erroneous "wage theft" claim.

3.    <u>The Undisputed Facts Demonstrate That Plaintiff's Hours Worked and Tips Received Were Correctly Recorded</u>.

In her Declaration, Named Plaintiff states that "we never needed to rely on the timeclock to track our hours worked and were not required to clock out at the end of the shift." (Appendix 15, ¶3.) She further states, "As such, I was not provided an opportunity to accurately record all of my hours worked…." (Id. at ¶4.) Documentary evidence shows that the Defendants accurately maintained records of hours worked by all servers using POS systems. (See Appendix Nos. 1-14, Manager and CPA Declarations.)

Named Plaintiff also asserts that the Restaurants did not record cash tips: this claim also is refuted by undisputed record evidence that the Defendant Restaurants did both. (Id.) For example, in the pay period from 7/9/17 to 7/22/17 (page 4 of Appendix 21), Named Plaintiff recorded cash tips each day. In the table below, the column marked "CC Tips" refers to Credit Card Tips and the column "Decl Tips" refers to Declared Tips (total tips received). The difference between "Decl Tips" and "CC Tips" is cash tips:

| CC Tips | Decl Tips | Cash Tips Recorded |
|---|---|---|
| 100.82 | 134.00 | 33.18 |
| 81.81 | 90.00 | 8.19 |
| 83.54 | 83.64 | 0.10 |
| 68.39 | 70.00 | 1.61 |
| 123.91 | 135.00 | 11.09 |
| 78.52 | 98.00 | 19.48 |
| 83.57 | 87.00 | 3.43 |
| 94.96 | 100.00 | 5.04 |
| 109.24 | 167.00 | 57.76 |

This table shows that the restaurants where Named Plaintiff worked recorded her cash tips as well as credit card tips through the POS system, in compliance with the FLSA. Defendants have come forward with payroll records that demonstrate that cash tips were recorded on the earnings statements at all the Defendant Restaurants, as the remainder from declared tips minus credit card tips. (Appendix Nos. 1-11, Declarations of Managers, ¶¶6, 7, and 8.)

Named Plaintiff's unsupported statement that Defendants failed to record hours worked and cash tips received is contradicted by this undisputed documentary evidence. Additionally, Named Plaintiff has failed to provide any evidence that other members of the conditionally-certified class did not have their hours or cash or credit card tips correctly recorded.

Defendants have carried their burden on this issue. Plaintiff now must shoulder the burden of coming forward with evidence to dispute Defendants' facts. In *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 66 S. Ct. 1187 (1946) the Supreme Court confirmed that an employer has a statutory duty to keep proper records of all hours worked. Only if the employer fails to do so may employees meet their burden by proving that they in fact "performed work for which [they were] improperly compensated and ... produc[ing] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.,* at 687, 66 S. Ct. 1187; *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1040 (2016). In this case, however, Defendants have come forward with evidence of hours worked and tips received from data in their individual POS system. Plaintiffs cannot avoid summary judgment merely by disagreement: they must come forward with their own evidence and cannot simply assert that they dispute Defendants' evidence. "At the summary judgment stage, the absence of evidence on an issue redounds to the detriment of the party who bears the burden of proof on that issue." *Perez v. Lorraine Enters., Inc.*, 769 F.3d 23,

30 (1st Cir. 2014). Because Plaintiffs cannot do so summary judgment should be entered in favor of all Defendants.

### 4. Tip Pools Were in Compliance with the FLSA.

Named Plaintiff states in her declaration that though she was not required to participate in a tip pool at the restaurants where she worked, it was explained to her that she was required to pay 3% of her sales to chip and busboys and a flat per-shift fee of $8 or $12 to a bartender. (Appendix 15 ¶6.) While Defendants dispute her assertion that there was no tip pool where Plaintiff worked, it is not material because the practices Plaintiff complains of are condoned under the FLSA. Chip and busboys and bartenders all are proper participants in a tip pool. See 29 CFR §§531.52, 531.54, and 531.59. Tip pooling also is permitted under the NCWHA. N.C. Gen. Stat. Ann. §95-25.3(f).

Section 203(m) requires employers to inform employees of the provisions contained in section 203(m). In her declaration Named Plaintiff affirms that she was informed that she would be sharing a small percentage of her sales with other staff members – chip and busboys – who qualified to participate in the tip pool. (Appendix 15, ¶6.) Bartenders, chips and busboy personnel are appropriate participants in a tip pool because they are employees who regularly receive a portion of their wages from tips. See 29 C.F.R. §531.54; *see also Marshall v. Krystal Co.,* 467 F.Supp. 9, 13 (E.D. Tenn.1978) (stating that waiters, bus persons, and bartenders who "receive customarily and regularly as tips from customers or by apportionment of such pools amounts exceeding [the amount required by subsection 203(t)] monthly, each" are eligible to participate in a tip pool); *Kilgore v. Outback Steakhouse of Fla., Inc.*, 160 F.3d 294, 301 (6th Cir. 1998) (same); see also Wage & Hour FOH §30d04 ("It is not required that all employees who receive tips from a mandatory tip pool themselves receive tips from customers as long as they work in an occupation recognized as one in which employees customarily and regularly receive tips. The amounts

retained by the employees who actually receive the tips, and those given to other pool participants, are considered the tips of the individuals who ultimately retain them, in applying the provisions of sections 3(m) and 3(t).")

The Fourth Circuit has not ruled directly on this issue, but the Sixth Circuit noted that such employees may properly be included in a tip pool:

> Employees who receive tips from a tip pool are employees who "receive tips" according to Department of Labor regulations, case law, and Department of Labor practices. "Where employees practice tip splitting, as where waiters give a portion of their tips to busboys, the amounts retained by the waiters and those given the busboys are considered tips of the individuals who retain them, in applying the provisions of section 3(m) and 3(t)." 29 C.F.R. §531.54 (1996); *see also Marshall v. Krystal Co.,* 467 F.Supp. 9, 13 (E.D.Tenn.1978) (stating that waiters, bus persons, and bartenders who "receive customarily and regularly as tips from customers *or by apportionment of such pools* amounts exceeding [the amount required by subsection 203(t) ] monthly, each" are eligible to participate in a tip pool (emphasis added)); U.S. Dept. of Labor Field Operations Handbook §30d04(a) ("It is not required that all employees who share in tips must themselves receive tips from customers."). This approach is consistent with the statutory language, which does not require that an employee directly receive the requisite amount of tips from customers

*Kilgore*, 160 F.3d at 301. The Fifth Circuit has agreed:

> The DOL has provided examples of occupations that "customarily and regularly receive tips" and those that do not. Its Field Operations Handbook ("Handbook") lists "waiters/waitresses"; "bellhops"; "counter personnel who serve customers"; "busboys/girls (server helpers)"; and "service bartenders" as tipped occupations and "[j]anitors"; "[d]ishwashers"; "[c]hefs or cooks"; and "[l]aundry room attendants" as non-tipped occupations. U.S. Dep't of Labor, Field Operations Handbook §30d04(a), (c) (1988).

*Montano v. Montrose Rest. Assocs., Inc.*, 800 F.3d 186, 190–91 (5th Cir. 2015); see also *Wai Man Tom v. Hosp. Ventures LLC*, 355 F. Supp. 3d 329, 333 (E.D.N.C. 2018) (appeal pending).

Named Plaintiff fails to show that the tip pools at the restaurants where she worked were improper. There is no evidence as to practices at other restaurants, only unsupported hearsay statements. Because Plaintiffs cannot be harmed by a practice that is not illegal, this claim must be dismissed. No harm, no foul.

5.    Plaintiffs Have Failed to Present Evidence That Any Individual Defendant is an Employers Within the Meaning of the FLSA and NCWHA.

Named Plaintiff cannot establish that the individual defendants are employers under the FLSA and NCWHA and thus can assert no claim against any individual defendant. There is no evidence that these individuals personally engaged in the sort of conduct that the FLSA requires to hold an individual personally liable as an employer.

The FLSA defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. §203(d); *Luna-Reyes v. RFI Const., LLC*, 57 F. Supp. 3d 495, 500–01 (M.D.N.C. 2014). Factors commonly relied on by courts in determining the extent of an individual's operational control over employees include whether the individual: (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *See id.* (citing *Herman v. RSR Sec. Servs.*, 172 F.3d 132, 139 (2d Cir. 1999)); *see, e.g., United States Dep't of Labor v. Cole Enters., Inc.*, 62 F.3d 775, 778 (6th Cir. 1995) (finding individual defendant liable under the FLSA where he had power over hiring, firing, rates of pay, schedule and payroll); *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 329 (5th Cir. 1993) (finding individual liable under the FLSA where he hired employees and signed their payroll checks); *Patel v. Wargo*, 803 F.2d 632, 638 (11th Cir. 1986) (explaining an officer is personally liable if involved in day-to-day operations or has some direct responsibility for the supervision of the employee). These factors are not exclusive nor is any one factor dispositive. *Miller*, 2003 U.S. Dist. LEXIS 20702, at *10, 2003 WL 22717592, *3. "[R]ather, the determination of whether a particular individual had sufficient operational control within a business enterprise to be considered an 'employer' for purposes of the FLSA requires a

consideration of all of the circumstances and relevant evidence." *Id.*; see also *Garcia v. Frog Island Seafood, Inc.*, 644 F. Supp. 2d 696, 721 (E.D.N.C. 2009).

In *Frog Island*, the court found that the plaintiffs failed to allege sufficient facts regarding the individual defendant's control over them to make him liable as their employer. The individual, who owned the seafood processing plant where they were employed, had no role in hiring the workers, although he was responsible for hiring the supervisor who recruited them. He had little direct involvement with the seafood processing operations and never observed the process. The supervisor consulted with him about certain aspects of the workers' employment from time to time, but he was not involved with timecards or payroll. *Frog Island*, 644 F. Supp. 2d at 721. The court granted the individual defendant's motion for summary judgment and dismissed all claims against him.

Although Hector Flores is a part owner of the Restaurants where Named Plaintiff worked, he did not personally engage in day-to-day supervisory activities at the two restaurants that could qualify him as being an "employer" and enable him to be held personally liable as being an employer under the FLSA or NCWHA. Like the plant owner in *Frog Island*, Hector Flores testified to his non-involvement in the day-to-day operations of the two restaurants. He testified that he played no role in paying people. (Appendix 23 at 142-143.) He did not check the mail, did not run the business, left all of the paperwork to the two on-site managers, did not even visit the restaurants more than once a month, and has no role in hiring, firing or pay decisions, . . . (Id. at 101-103, 133-135.) He testified that he had never even met the Named Plaintiff.

It is well settled that an individual will qualify as an "employer" under the FLSA only if he or she exercised extensive managerial responsibilities and "substantial control of the terms and conditions of the work of [plaintiff] employees." *Falk v. Brennan,* 414 U.S. 190, 195, 94 S. Ct.

427 (1973); *see also Brock v. Hamad,* 867 F.2d 804, 808 n. 6 (4th Cir. 1989) (finding manager was liable for FLSA violations as an "employer" because "he hired and directed the employees who worked for the enterprise."). An individual who is a passive owner or investor but is not involved in day-to-day management or decision making, is not an "employer" within the meaning of the FLSA. Because the undisputed facts show that Hector Flores was just such a passive owner/investor, he should be dismissed.

Named Plaintiff deposed Hector Flores and claimed that "he **refused** to testify about Defendants' current pay practices at all locations." (Dkt. 67 at 14) (emphasis added.) This is not supported by the transcript: Hector Flores insisted that he was not in the restaurants, did not run the restaurants, was not involved in paying people or managing the restaurants, and thought that there were no violations following the resolution of the USDOL investigation. (Appendix 20 at 102-103, 142.) He was not an "employer" within the meaning of the FLSA because he played no role in management or setting the terms or conditions for the work or pay of employees.

As in the corporate employer context, "courts generally look at the 'economic reality' of an individual's status in the workplace before determining liability." *Gionfriddo v. Jason Zink, LLC,* 769 F.Supp.2d 880, 890 (D. Md. 2011) (*citing Schultz,* 466 F.3d at 304; *Goldberg v. Whitaker House Coop., Inc.,* 366 U.S. 28, 33, 81 S. Ct. 933 (1961)). The "economic reality" includes a number of factors, "such as the person's job description, his or her financial interest in the enterprise, and whether or not the individual exercises control over the employment relationship." *Gionfriddo,* 769 F.Supp.2d at 890 (*citing Baystate Alt. Staffing v. Herman,* 163 F.3d 668, 675 (1st Cir. 1998)). "An individual's status as a high-level corporate shareholder or officer does not automatically impart 'employer' liability to that individual, as individual liability 'is dictated by

the economic reality of the employment relationship.'" *Guapos III,* 970 F. Supp. 2d at 416–17 (citations omitted).

At his deposition, Hector Flores testified that he did not know the Plaintiff, played no role in the management of any restaurant, and rarely even visited the restaurants where she had worked. (Appendix 20 at 117, 125-26, 134, 141.) His partial ownership interest, without more, does not suffice to qualify him as Named Plaintiff's employer.

In addition, Defendants' Verified Supplemental Interrogatories Responses provided evidence showing that Alberto Flores, Jose Perez, and Vicente Perez, also are passive investors. (Appendix 16.)

      6.    <u>Plaintiff's Class Claims Are Due to Be Dismissed for Want of Evidence</u>.

It is axiomatic that summary judgment may be granted only when there exist no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson.,* 477 U.S. at 247, 106 S. Ct. at 2509–10. The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S. Ct. at 2552–53. But once the moving party has met its burden, the non-moving party must come forward and demonstrate that such a fact issue does exist. M*atsushita Electric Co.,* 475 U.S. at 587, 106 S. Ct. at1356. At this point the nonmoving party – Plaintiff here – cannot rest on mere allegations. The Supreme Court has explained that:

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof.

*Celotex,* 477 U.S. at 322–23, 106 S. Ct. at 2552. The moving party therefore can meet its burden as to an issue—proof at trial of which will rest on the non-movant—by demonstrating that there is a lack of evidence to support the non-moving party's case. *Id.* at 325, 106 S. Ct. at 2553–54. That is precisely the situation where this case stands. With declarations from managers and accountants Defendants have met their burden of proof as to the disparate and independent nature of the restaurants, their lack of common ownership, absence of coordinated purchasing, advertising, policies or practices, And there is an utter and complete lack of evidence on the nonmoving Plaintiff's side to dispute this evidence. Defendants have presented overwhelming evidence that each restaurant is individually owned, separately managed, and separately controlled. There is no basis for finding the existence of a single enterprise or joint employer. Defendants have proven there was no centralized or overarching decision-making nor any consolidated control structure. Each restaurant functioned independently of the others.

Conclusory allegations or denials, without more, are insufficient for purposes of summary judgment. *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 365 (4th Cir.1985). Judged by this standard, and in the face of overwhelming evidence demonstrating that the Defendants operated independently of each other and shared no organizational attributes that would cast them as a single enterprise, summary judgment against Plaintiffs on their class claims should be granted.

## CONCLUSION

For the foregoing reasons Defendants respectfully request that summary judgment be granted in their favor and that Plaintiffs' claims be dismissed.

Respectfully submitted this 11th day of February 2020.

*/s/ J. Larry Stine*
J. Larry Stine
Wimberly, Lawson, Steckel,
 Schneider & Stine, P.C.
Suite 400, Lenox Towers

3400 Peachtree Road, N.E.
Atlanta, Georgia 30326
Phone: (404) 365-0900
Fax: (404) 261-3707
jls@wimlaw.com
Georgia Bar No.: 682555

*/s/ Henry W. Jones, Jr.*
Henry W. Jones, Jr.
JORDAN PRICE WALL GRAY JONES
 & CARLTON, PLLC
P.O. Box 10669
1951 Clark Avenue
Raleigh, North Carolina 27605
Telephone: (919) 828-2501
Fax: (919) 831-4484
hjones@jordanprice.com
North Carolina Bar No. 8343
*Local Civil Rule 83.1(d) Counsel for Defendants*


*/s/ Lori P. Jones*
Lori P. Jones
JORDAN PRICE WALL GRAY JONES
 & CARLTON, PLLC
P.O. Box 10669
1951 Clark Avenue
Raleigh, North Carolina 27605
Telephone: (919) 828-2501
Fax: (919) 831-4484
ljones@jordanprice.com
North Carolina Bar No. 32872
*Local Civil Rule 83.1(d) Counsel for Defendants*

*Counsel for Defendants*